# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA
# PITTSBURGH

| | |
|---|---|
| SHAWN LEE WHITENIGHT, ) | |
| ) | 2:16-cv-00646 |
| Plaintiff, ) | |
| ) | Chief United States Magistrate Judge |
| vs. ) | Cynthia Reed Eddy |
| ) | |
| THOMAS ELBEL, WARDEN JEFFERSON ) | |
| COUNTY JAIL; PRIME CARE MEDICAL, ) | |
| MEDICAL VENDER JEFFERSON ) | |
| COUNTY JAIL; SUSAN ROSSINO, M.D. ) | |
| JEFFERSON COUNTY JAIL; JILL ) | |
| CLARK, PA-C, SITE MANAGER ) | |
| JEFFERSON COUNTY JAIL; JENIPHER ) | |
| PURCE, L.P.N.; AND DR. TERRI ) | |
| CALVERT, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION[1]

This is a *pro se* civil rights action initiated by Plaintiff, Shawn Lee Whitenight, who was incarcerated at Jefferson County Jail initially as a pretrial detainee from approximately December 17, 2013, to May 19, 2014, and, as a result of his sentencing, as a convicted prisoner from May 19, 2014 to June 3, 2014. The defendants are individuals employed by Jefferson County, including the Warden, and the contract medical physicians and staff. Whitenight asserts that he was denied adequate medical treatment and that he was retaliated against for speaking out about this inadequate treatment. He also brings a due process claim stemming from his placement on suicide watch, and multiple state law claims.

---

[1] In accordance with the provisions of 29 U.S.C. § 636(c)(1), all parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including trial and the entry of a final judgment. *See* ECF Nos. 37, 39, 42, and 43.

1

Currently, three motions for summary judgment are pending before the Court: (1) ECF No. 178 filed by Warden Thomas Elbel (ECF No. 178); (2) ECF No. 185 filed by Jill Clark, LPN; Jenipher Pierce, LPN; and Terri Calvert, a psychiatrist, employees of the jail's medical contractor, PrimeCare Medical, who treated Whitenight during the relevant time period (collectively referred to as the "PrimeCare Defendants"); and (3) ECF No. 181 filed by Susan Rossino, M.D., a medical doctor under contract to see prisoners at Jefferson County Jail. Whitenight directly responded to each of these motions (ECF Nos. 199, 200, 202, 203, 196, and 197) and Defendants each filed reply briefs (ECF Nos. 205, 206, and 210).

The motions are fully brief and are ripe for disposition. After careful consideration of the motions, the voluminous material in support and opposition thereto, the memoranda of the parties in support and opposition thereto, the relevant case law, and the record as a whole, the Court will grant summary judgment as to all federal claims. The Court will not exercise supplemental jurisdiction over the state law claims and these claims will be dismissed without prejudice to refiling in an appropriate state forum.

**Background[2]**

The relevant background is well known to the parties and was fully discussed in the Court's Memorandum Opinion of December 5, 2017. (ECF No. 102). Whitenight was arrested on December 17, 2013, by the Pennsylvania State Police and he claims that during his arrest he suffered injuries to his back. In this case, Whitenight alleges that during his incarceration at Jefferson County Jail he was denied medical treatment for those injuries. He also alleges that he

---

[2] At the time Whitenight initiated this lawsuit, he was a Pennsylvania state prisoner housed at SCI-Greene. He notified the Court on October 24, 2017, that he had been released from DOC custody. (ECF No. 95).

was placed in solitary confinement/ suicide protocol in retaliation for complaining about his perceived lack of appropriate medical treatment.

## **Standard of Review**

The standard for assessing a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure is well-settled. A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact. *See Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

This standard is somewhat relaxed with respect to *pro se* litigants. Where a party is representing himself *pro se,* the filings are to be construed liberally. Thus, if the Court can reasonably read Plaintiff's pleadings together with his summary judgment submissions to show an entitlement to relief, the Court should do so despite any failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements. *Boag v. MacDougall*, 454 U.S. 364 (1982); *United States ex rel. Montgomery v. Bierley*, 141 F.2d 552, 555 (3d Cir. 1969) (although a filing prepared by a prisoner may be inartfully drawn, it should be read "with a measure of tolerance"). Nonetheless, at the summary judgment stage of the proceedings, the Court is not required to credit any "bald assertions" or "legal conclusions" that are unaccompanied by evidentiary support. *Jones v. UPS,* 214 F.3d 402, 407 (3d Cir. 2000); *see also Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment.").

## Discussion

The following claims remain following the Court's ruling on the Defendants' motions to dismiss: (1) claims against all Defendants alleging that Whitenight's due process rights were violated when he twice was placed on suicide watch protocol; (2) claims against all Defendants alleging he was placed on suicide watch in retaliation for complaining about his inadequate medical treatment; (3) claims against the PrimeCare Defendants and Dr. Rossino alleging deliberate indifference to Whitenight's serious medical needs; and (4) state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, conspiracy, and medical negligence/ medical malpractice. *See* Memorandum Opinion and Order granting in part and denying in part defendants' motions to dismiss. ECF Nos. 102, 103.

Discovery has now closed and Defendants have each filed motions for summary judgment.

A.  Due Process / Retaliation Claims Arising from Whitenight's Placement on Suicide Watch.

Whitenight was placed on suicide watch on two occasions: March 29, 2014, and April 17, 2014. He contends that his placement on suicide watch violated his Fourteenth Amendment right to due process and his First Amendment right as his placement on suicide watch was in retaliation for him complaining about his inadequate medical treatment.

Before turning to the merits, two preliminary issues must be addressed. First, all Defendants argue that any claims arising from Whitenight's March 29, 2014, placement on suicide watch are barred by the statute of limitations.[3] It is well settled that claims brought pursuant to 42 U.S.C. § 1983 are subject to the statute of limitations for personal injury. *Wilson v. Garcia*, 471 U.S. 261, 266 (1985). In Pennsylvania, the statute of limitations for a personal injury action is two years. 42 Pa.C.S.A. § 5524. *See Smith v. Holtz*, 87 F.3d 108, 111 n.2 (3d Cir. 1996). As such, for § 1983 actions brought in federal courts located within the Commonwealth of Pennsylvania, the appropriate limitations period is two years. *Id. See Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998) (holding that federal courts apply the state statute of limitations for personal injury in Section 1983 cases which in Pennsylvania is two years).

The statute of limitations requires that a complaint be filed within its time limits from the time a cause of action accrues. The date of accrual of claims brought under Section 1983 is governed by federal law. *Wallace v. Keto*, 549 U.S. 384, 388 (2007); *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998). Under federal law " 'the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the

---

[3]  The PrimeCare defendants also argue that Whitenight's claims relating to his suicide placement on April 17, 2014, are also time barred. However, the original complaint in this matter has been deemed filed as of April 22, 2016. Therefore, there is no time bar to that claim.

section 1983 action'." *Montgomery v. De Simone,* 159 F.3d at 126 (quoting *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 909 (3d Cir 1991)). *See Wallace*, 549 U.S. at 388 ("[I]t is the standard rule that [accrual occurs] when the plaintiff has a complete cause of action . . . that is, when the plaintiff can file suit and obtain relief) (internal quotations and citations omitted).

It is undisputed that Whitenight was placed on suicide watch on March 29, 2014, after he threatened self-harm. Thus, Whitenight had a complete cause of action as of March 29, 2014. He was therefore required to file a complaint raising his claims by March 30, 2016. Because the original complaint in this matter has been deemed filed on April 22, 2016,[4] any claim arising out of Whitenight's placement on suicide watch on March 29, 2014, is time barred. In so holding, the Court has rejected Whitenight's arguments that this claim is rendered timely under the continuing violations doctrine. The continuing violations doctrine does not apply to discrete and independent acts. Here, each time Whitenight was placed on suicide watch, he had a cause of action available to him. As such, Whitenight's claims arising from his March 29, 2014, placement on suicide watch are barred by the statute of limitations.

Even assuming *arguendo* that such claims were not time barred, for the reasons discussed below, Defendants are entitled to summary judgment as the record shows that Whitenight has presented no set of facts from which a fact finder could find that his constitutional rights were

---

[4] Under the prisoner mailbox rule, a prisoner's complaint is deemed as having been filed on the date on which it is properly placed in the prison mailing system. The date Whitenight placed his complaint in the prison mailing system is unknown. The complaint does not have a verification indicating the date this was done, and Whitenight signed the complaint on two different pages, with two different dates. Compare ECF No. 1-1 at 5, signed and dated April 15, 2016, with ECF No. 1-3 at 36, signed and dated April 22, 2016. Additionally, the post mark on the envelope is illegible. *See* ECF No. 1 - 77. However, given Whitenight's *pro se* status, the Court will deem April 22, 2016 as the filing date.

violated by his placement on suicide watch on March 29, 2014. Summary judgment will be granted to all defendants on this claim.

Warden Elbel also argues that he is entitled to summary judgment on both of Whitenight's claims regarding his placement on suicide watch as such claims are barred procedurally by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) (the "PLRA"), as he failed to exhaust his administrative remedies before filing this lawsuit. The United States Court of Appeals for the Third Circuit, in a recent unpublished opinion, reiterated the analytical structure for a failure-to-exhaust affirmative defense:

> As formulated in this Circuit, the failure-to-exhaust affirmative defense has two distinct stages. The first inquiry is whether the prison-employee defendants can demonstrate that the inmate failed to exhaust the on-the-books remedies. *See Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (explaining that the prison's grievance policy supplies " 'the yardstick' for determining what steps are required for exhaustion" (quoting *Spruill v. Gillis,* 372 F.3d 218, 231 (3d Cir. 2004))); *see also Ross v. Blake*, 136 S.Ct. 1850, 1859 (2016); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). If the defendants can make that showing, then at the second stage, the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her.[1] *See Rinaldi*, 904 F.3d at 268.
>
> [1] This order of evaluation is not absolute, and it is permissible to consider the second stage first, *see, e.g., Small,* 728 F.3d at 271-72, but this ordering is consistent with the prison-employee defendants bearing the burden of production at the first stage, before the inmate plaintiff inherits the burden at the second.
>
> The state of facts dictates the appropriate legal standard for evaluating the exhaustion defense. If there is no genuine dispute of material fact, then the exhaustion defense may be evaluated as a matter of law at summary judgment. If there is a genuine dispute of material fact related to exhaustion, then summary judgment is inappropriate . . . .

*West v. Emig,* No. 18-3806, -- F. App'x --, 2019 WL 5061417, *2 (3d Cir., Oct. 9, 2019) (non-precedential). Here, because Defendant Elbel has moved for summary judgment, the analysis turns on a matter of law.

7

Whitenight's main argument in response is that the on-the-book grievance process was not available to him. He argues that the grievance policy states that an intermediate step of the process requires the deputy warden to answer the grievance, and Jefferson County Jail violated its own policy because there was no deputy warden at the Jefferson County Jail.[5] Whitenight's argument is belied by the uncontroverted summary judgment record which reflects that as of March 14, 2014, the grievance protocol was revised and "especially assigned lieutenants" were assigned to answer grievances, as there was no longer a deputy warden at the facility. (ECF No. 180-5, Exh. 5, Grievance Policy, ¶ 4, Policy revised on 3/14/2014). In fact, on March 27, 2014, Whitenight filed a grievance complaining that Jefferson County Jail was in violation of its own grievance policy. (ECF No. 180-4 at 15-16). On March 31 2014, in denying this grievance, Warden Elbel specifically stated "[t]he only change to protocol was an especially assigned lieutenant answered the grievance instead of a deputy warden. The facility no longer maintains a deputy warden position, therefore certain duties have been passed to lieutenants. Answering grievances is one of these duties." (ECF No. 180-4 at 20).

Interestingly, although he argues that grievance procedures were not available, Whitenight participated in the grievance process during the relevant time period, as he filed a grievance on April 22, 2014, related to a medical issue, while he was on suicide watch, that was appealed to and heard by Lt. Klepfer. It is inconsistent for Whitenight to now argue that the grievance process was not available to him when (1) he had been specifically informed on March 31, 2014, that the Grievance Policy had been revised and "especially assigned lieutenants" answered the grievances

---

[5] The grievance policy in effect at the time of Whitenight's second suicide watch placement, specifically states that "[g]rievances are answered by the designated lieutenant." Whitenight argues that he was not given this revised policy. Even if that is so, the undisputed summary judgment record evidence shows that Warden Elbel informed Whitenight of the change in policy on March 31, 2014.

because there was no deputy warden at the facility and (2) he filed a grievance on April 22, 2014, (while still on suicide watch). Further, there is absolutely no summary judgment record evidence that demonstrates Whitenight ever requested an appropriate grievance form or filed any type of grievance about either of his placements on suicide watch.

For all these reasons, the Court finds that Warden Elbel is entitled to summary judgment on Whitenight's claims about his placement on suicide watch as such claims are barred procedurally by the PLRA for failure to exhaust administrative remedies. However, even assuming *arguendo* that such claims were not procedurally barred by the PLRA, for the reasons discussed below, Defendant Elbel is entitled to summary judgment as the summary judgment record contains no evidence from which a fact finder could conclude that Whitenight's constitutional rights were violated by his placement on suicide watch on March 29, 2014, or April 17, 2014.

The Court will now turn to the merits of these claims. "Pretrial detainees do not have a liberty interest in being confined in the general population, [but] they do have a liberty interest in not being detained indefinitely in [restrictive housing] without explanation or review of their confinement." *Singleton v. Superintendent Camp Hill SCI*, 747 F. App'x 89, 92 (3d Cir. 2018) (quoting *Bistrain v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012)). "Thus, procedural due process requires prison officers to 'provide detainees who are transferred into more restrictive housing, for administrative purposes only, an explanation of the reason for their transfer as well as an opportunity to respond." *Bistrian*, 696 F.3d at 375 (quoting *Stevenson v. Carroll,* 494 F.3d 62, 70 (3d Cir. 2007)).

The Suicide Prevention Program of Jefferson County Jail provides that "an inmate who has been identified as being potentially suicidal is placed in a camera cell where regularly scheduled,

9

documented monitoring observations are made." (ECF No. 180-2, Suicide Prevention Program).

There are three levels of suicide watch:

> Level 1 - Suicide Watch. Level 1 is for inmates who are not actively suicidal but express suicidal ideation and a have plan to commit suicide. Prisoners indicating the potential for self-harm should be placed on this level of watch.
>
> Level 2 - Suicide Watch. Level 2 is for inmates who have suicidal ideation but no plan to commit suicide and/or have a prior history of self-destructive behavior. This also applies to inmates that deny suicidal ideation, but demonstrate other concerning behavior, including the potential for self-injury.
>
> Level 3 - Psychiatric Observation. Level 3 is not used for suicide prevention, but is reserved for the inmate whose behavior warrants closer observation.

*Id*. The undisputed summary record evidence demonstrates that Whitenight threatened self harm on two occasions, both while he was a pre-trial deta2inee. On March 29, 2014, he was placed on suicide watch after he threatened to jump off a sink or run into a wall. (ECF No. 188-1 at PMC126). He remained on Level 1 suicide precautions until April 2, 2014, when Dr. Calvert ordered that he be stepped down to Level 2. (*Id*. at PMC18-19). He remained on Level 2 suicide precautions until April 7, 2014, when Dr. Calvert ordered that he be stepped down to Level 3 - psychiatric observation. (*Id*. at PMC22). Dr. Calvert removed Whitenight from all suicide precautions on April 10, 2014. (*Id.* at PCM23). Between March 29, 2014 and April 10, 2014, the uncontroverted summary judgment medical record evidence reflects that Whitenight was assessed for potential suicidality on approximately twenty-one different occasions.

A week later, on April 17, 2014, Whitenight again threatened self-harm when he told Nurse Pierce that he was going to "make a homemade cervical device," which Nurse Pierce interpreted as being a noose. *(Id*. at PCM25). Dr. Calvert ordered that Whitenight be placed on Level 1 suicide precautions. (*Id.* at PCM26). On April 22, 2014, Dr. Calvert ordered that Whitenight be stepped down to Level 2. (*Id*. at PCM28). Whitenight was removed from all suicide precautions

10

on April 28, 2014. (*Id*. at PCM30). Between April 17, 2014, and April 28, 2014, the uncontroverted summary judgment medical record evidence reflects that Whitenight was assessed for suicidal ideation at least fifteen times.

The summary judgment record reflects that at all times Whitenight was aware why he had been placed on suicide watch and that Defendants were concerned about Whitenight's mental health as his threats of self-harm were taken very seriously. At all times, Defendants followed the Suicide Prevention Protocol. Accordingly, the Court finds that Whitenight has produced no evidence from which a fact finder could determine that the PrimeCare Defendants or Dr. Rossino violated his due process rights by placing him on suicide watch on April 17, 2014.

Whitenight also alleges that his placement on suicide prevention was in retaliation for his complaints about his alleged inadequate medical treatment. In order to state a *prima facie* case of First Amendment retaliation, a prisoner / plaintiff must plausibly allege (1) that the conduct which led to the alleged retaliation was constitutionally protected; (2) he suffered an "adverse action" at the hands of prison officials, which requires demonstration that the adverse action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

The summary judgment record is completely void of any evidence demonstrating that Whitenight can meet his *prima facie* case. As discussed *supra*, he was placed on suicide watch only after he made threats of self-harm, which the physicians and medical staff took very seriously. There is absolutely no evidence establishing any causal link between his complaints about his medical care and his placement on suicide watch.

For these reasons, summary judgment will be granted to all defendants on Whitenight's claims of violations of his due process rights and First Amendment rights when he was placed on suicide watch on March 29, 2014, and April 17, 2014.

B.  <u>Claims for Deliberate Indifference to Whitenight's Serious Medical Needs</u>.[6]

Whitenight contends that Defendants' inadequate medical care for his back and neck pain amounts to deliberate indifference to his serious medical needs. He further alleges that due to non-medical reasons, Defendants refused to order medical tests, which put his health in jeopardy.[7]

Defendants first argue that these claims are barred by the two year statute of limitations. They argue that from the time Whitenight entered the Jefferson County Jail, he continually complained of neck and back pain and began complaining about deficient medical treatment as early as February 12, 2014. Therefore, according to Defendants, Whitenight knew at that time he had a cause of action and should have filed his lawsuit within two years of that date.

Whitenight filed his original complaint was on April 22, 2016, two years after he first began complaining of inadequate medical treatment. Thus, absent any equitable tolling, Whitenight's claims relating to the denial and delay of medical treatment prior to April 21, 2014, two years before his date of filing, would be time barred. Whitenight responds that his claims should not be ruled time-barred because Defendants' actions were part of a continuing pattern to deny and delay appropriate medical treatment.

---

[6]  Whitenight's claim that PrimeCare Medical had a policy or custom of denying pretrial detainees outside or referral medical care was dismissed by the Court in its Memorandum Opinion and Order granting in part and denying the Defendants' motion to dismiss.

[7]  The Court takes judicial notice that Whitenight brought two lawsuits against the DOC and its employees and medical contractors raising almost identical issues to those raised in this case. *See Whitenight v. Harry*, Civil No. 4: 16-cv-1350 (M.D. Pa.), alleging inadequate medical treatment while housed at SCI Camp Hill; and *Whitenight v. Wetzel*, No. 16-0646 (W.D. Pa.), alleging inadequate medical treatment while housed at SCI-Greene (W.D. Pa).

In *Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir. 2001), our court of appeals described the continuing violations doctrine in the context of a § 1983 action as an equitable exception to a strict application of a statute of limitations where the conduct complained of consists of a pattern that has only become cognizable over time:

> The continuing violations doctrine is an "equitable exception to the timely filing requirement." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). Thus, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991). In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts." *West*, 45 F.3d at 755 (quotation omitted). Regarding this inquiry, we have recognized that courts should consider at least three factors: (1) subject matter - whether the violations constitute the same type of [act]; (2) frequency - whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence - whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his rights [ ]. *Id.* at 755 n.9 (citing *Berry v. Bd. of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983)). The consideration of "degree of permanence" is the most important of these factors. *See Berry*, 715 F.2d at 981.

Thus, in order to overcome the apparent untimeliness of medical care claims, a prisoner seeking to rely upon a continuing violations theory, "may pursue a claim for conduct that standing alone would have been untimely as it occurred before the start of the applicable statute of limitations period as measured back from the time of the filing of the action." *McAleese v. Brennan*, 483 F.3d 206, 218 (3d Cir. 2007). However, "time-barred claims cannot be resurrected by being aggregated and labeled continuing violations." *O'Connor v. City of Newark*, 440 F.3d 125, 129 (3d Cir. 2006).

Numerous courts have considered prisoner-plaintiff's invocation of the continuing violations doctrine in cases alleging that prison officials were deliberately indifferent to their medical needs, but where the prisoner-plaintiff failed to bring suit within the required limitations

period. In many such cases, courts have concluded that a plaintiff knew or should have known of his claims at the time that medical treatment was denied. Others courts have found that a persistent and ongoing refusal to grant surgery or other medical treatment to a prisoner may in fact constitute a continuing violation. *Carter v. Pennsylvania Dept. of Corrections*, No. 08-0279, 2008 WL 5250433 (E.D. Pa. Dec. 17, 2008).

After careful consideration of the parties' arguments, the Court finds that the facts as presented in this case support application of the continuing violations doctrine. The undisputed summary judgment record evidence reflects that Whitenight continually complained of back and neck pain and his perceived inadequate medical treatment during his incarceration at Jefferson County Jail. Therefore, for purpose of this Memorandum Opinion only, the Court will consider Defendants' conduct to have been a part of continuing course of conduct.

Turning to the merits,[8] Whitenight alleges that Defendants were deliberately indifferent to his serious medical needs because he had to wait six months to receive an MRI or be referred to a specialist and he was denied medical treatment for non-medical reasons. In accordance with the Eighth Amendment's prohibition against cruel and unusual punishment, the government is obliged "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Id.* at 104 (citation omitted). "[W]hether the indifference is manifested by prison doctors in their

---

[8]     For purposes of analyzing Whitenight's medical indifference claim, the legal analysis is the same whether Whitenight was a pretrial detainee or a convicted person. The United States Court of Appeals for the Third Circuit has indicated that a pretrial detainee's right to adequate medical care should be analyzed under the well-settled standard established in *Estelle v. Gamble,* 429 U.S. 97 (1976), which provides that prison officials are required "to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle,* 429 U.S. 97 (1976)).

14

response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed . . . deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id*. at 104–05 (citations omitted).

A medical need is "serious" if "it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted). "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." *Id.* Defendants do not challenge that Whitenight's neck and back pain are serious medical issues.

The "deliberate indifference" a plaintiff must allege lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other" and is frequently equated with recklessness as that term is defined in criminal law. *Farmer v. Brennan,* 511 U.S. 825, 836–37 (1994). This standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients." *Inmates of Allegheny Cnty. Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979). Where a prisoner has received medical care and only the adequacy of the treatment is disputed, courts are often reluctant to second guess professional medical judgment. *See id*. However, deliberate indifference can be manifested by an intentional refusal to provide care, delayed medical treatment, and the denial of prescribed medical treatment. *See Durmer,* 991 F.2d at 64; *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009) ("Deliberate indifference may be shown by intentionally denying or delaying medical care.").

A medical need is "serious" if "it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a

doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation omitted). "The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." *Id.*

Here, the undisputed summary judgment record demonstrates that during Whitenight's incarceration at Jefferson County Jail, he was provided extensive and significant medical care for his neck and back pain. His complaints were continually addressed with evaluations and medications. During his six months at Jefferson County Jail, Whitenight was assessed by the nursing staff on at least eleven different occasions and seen by either a physician or physician assistant on at least ten different occasions *See* ECF No. 188-1, PrimeCare medical records. At various times throughout his incarceration, he was often non-compliant refusing to take Neurontin, Tylenol 3, and Effexor, which had been prescribed to help alleviate his complaints of pain.

Whitenight also contends that Defendants delayed in ordering an MRI for him. Whitenight arrived at Jefferson County Jail on December 17, 2014. During the next five months, he was given substantial treatment. The undisputed medical record of evidence indicates that an MRI was ordered for Whitenight on May 2, 2014, and approved by PrimeCare's corporate office on May 6, 2014. (ECF No. 188-1 at PMC31). To order a MRI after five months of extensive treatment, does not constitute delay of care. The MRI was scheduled on May 7, 2014, to occur on May 12, 2014. However, the MRI needed to be rescheduled to May 14, 2014, since Whitenight was scheduled for jury selection for his criminal charges on May 12, 2014. The MRI reports were received on May 15, 2014, and reviewed by Dr. Rossino on May 16, 2014. (*Id.* at PMC31, 32, and 158-60). After reviewing the MRI, Dr. Rossino determined that a consultation with an outside neurologist, Dr. Brookwater, was appropriate. (*Id.* at PMC33).

That same day, the PrimeCare medical staff made a call to the neurologist's office to schedule an evaluation. (*Id.* at PMC34). During the call, Dr. Brookwater's office informed PrimeCare staff that Whitenight's sister had already scheduled an appointment for May 22, 2014. (*Id*. at PCM34.) For security reasons, it is the policy of Jefferson County Jail that inmates cannot know the date of outside consultations. The next available appointment was June 3, 2014. (*Id*.) Other than his bald and unsupported assertion, Whitenight has produced no plausible evidence from which a fact finder would conclude that Defendants delayed scheduling his MRI for financial reasons.

The record shows that Whitenight was transferred to state correctional authorities on June 3, 2014. (*Id*. at PCM35).[9] He was provided three (3) days of medication and a Transfer of Health Information form was provided to the Department of Corrections at the time of his transfer to state custody. (*Id*. at PCM 35 and PCM 135). The Transfer of Health Information sheet clearly identified when Plaintiff was to have his neurosurgery consult and with whom. (*Id*. at PCM 135).

None of the Defendants had control over the timing of when Whitenight would be transferred to state custody. He was sentenced on May 19, 2014, and transferred into DOC custody on June 3, 2014. After his transfer, the state Department of Corrections was responsible for his medical needs.

It is clear from the undisputed record that Whitenight's claims amount to a disagreement with the course of treatment that the medical staff at Jefferson County Jail prescribed. It is a "well-

---

[9] According to public records, Whitenight was convicted after pleading guilty on May 16, 2014, to criminal attempt (Kidnapping and was sentenced that day to 48 months to 96 months. incarceration followed by a period of twelve years probation.). The Court of Common Pleas of Jefferson County imposed sentence on May 19, 2014. Jefferson County Court of Common Pleas Court Summary; Case No. CP-33-CR-000001-2014. (ECF No. 188-3). *See also* Whitenight's public criminal docket found at https://ujsportal.pacourts.us/DocketSheets/CP.aspx.

established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990). See *Foye v. Wexford Health Sources, Inc.*, 675 F. App'x 210, 215 (3d Cir. 2017) (medical defendants were not deliberately indifferent for failing to order an MRI consult at the inmate's request); *Gause v. Diguglielmo*, 339 F. App'x 132, 135-36 (3d Cir. 2009) (prison medical staff were not deliberately indifferent where inmate received medicine, physical therapy, and outside treatment, and where the inmate disagreed over the type of pain medication he received). In the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment has been disavowed by courts since such determinations remain a question of sound professional medical judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

The summary judgment record is void of any plausible evidence from which a fact finder could find that the PrimeCare Defendants or Dr. Rossino ever refused to provide Whitenight with appropriate medical care or that they delayed his treatment for non-medical reasons. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993).

For all these reasons, summary judgment will be granted to the PrimeCare Defendants and Dr. Rossino on Whitenight's claims of deliberate indifference to his serious medical needs.

C.    The Court Will Not Exercise Supplemental Jurisdiction Over State Law Claims

Whitenight's remaining claims allege various state law claims including, but not limited to, negligence, medical malpractice, intentional infliction of emotional distress, negligent infliction of emotional distress, and corporate negligence. A District Court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.A. § 1367(c). However, the Court of Appeals for the Third Circuit has recognized, "where the claim over which the district court has original

jurisdiction is dismissed before trial, the district court <u>must</u> decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995)) (emphasis in original).

Here, the Court has found that Defendants are entitled to summary judgment on all of Whitenight's constitutional claims. Considerations of judicial economy, convenience, and fairness do not provide an affirmative justification for maintaining Whitenight's state law claims. *Shaffer v. Bd. of Sch. Dir. of Albert Gallatin Area S.D.*, 730 F.2d 910, 912–13 (3d Cir. 1984) (noting that "time already invested in litigating the state cause of action is an insufficient reason to sustain the exercise of pendent jurisdiction" and that "decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law"). Because the Court will dismiss the federal claims, and as there is no diversity, the Court will dismiss all state law claims without prejudice for want of jurisdiction. *See Burnsworth v. PC Lab.*, 364 F. App'x 772, 776 (3d Cir. 2010) (affirming a district court's decision to decline supplemental jurisdiction over state law claims when the federal claims had been dismissed); *Alexander v. New Jersey State Parole Bd.*, 160 F. App'x 249, 251 (3d Cir. 2005) (same).

## **Conclusion**

For the foregoing reasons, the Court will grant each of the Defendants' Motions for Summary Judgment as to all federal claims. The Court will not exercise supplemental jurisdiction

over the state law claims and these claims will be dismissed without prejudice to refiling in an appropriate state forum. An appropriate Order follows.

Dated: December 13, 2019

>BY THE COURT:
>
>s/Cynthia Reed Eddy
>Cynthia Reed Eddy
>Chief United States Magistrate Judge

cc: SHAWN LEE WHITENIGHT
    182 Evansville Road
    Berwick, PA 18603
    (via U.S. First Class Mail)

    All Counsel of Record
    (via ECF electronic notification)